ALLEN, (McARTHUR v.)

[See McArthur v. Allen, Case No. 8,659.]

---

## Case No. 228.

### ALLEN et al. v. MACKAY et al.

[1 Spr. 219;[1] 16 Law Rep. 686.]

District Court, D. Massachusetts. Feb., 1854.

COLLISION — DAMAGES — ACT 1851, c. 43, § 3— FREIGHT PENDING.

1. It is the established rule in this court, that in case of collision, if both parties are in fault, the loss must be divided.

[Cited in The F. W. Gifford, Case No. 5,166.]

2. Where sailing vessels are approaching each other, one close-hauled, the other going free, it is the duty of the latter to clear the former. To this general rule, there may be exceptions.

[Cited in The F. W. Gifford, Case No. 5,166.]
[See the Argus, Case No. 521.]

3. A vessel lost by a collision, is to be paid for at her value when lost. By the statute of 1851, c. 43, § 3. [9 Stat. 635; Rev. St. 4283.] the owners of the vessel in fault are liable to the extent of the "freight then pending," as well as of the value of their vessel; and the term, "freight," includes the earnings of the vessel, in transporting the goods of her owners.

[Cited in The Glaucus, Case No. 5,478; The Ontario, Id. 10,543; The Bristol, 29 Fed. Rep. 873.]

[4. Cited in The Aleppo, Case No. 158, to the proposition that, in computing damages for marine torts, interest at six per cent. may be allowed on the cost of cargo, and all expenses and insurance actually paid.]

[5. Cited in The Mary Doane, Case No. 9,205, to the point that the lookout must be a person competent to give the requisite orders to the helmsman, in case of meeting a ship.]

[In admiralty. Libel in rem by Walter Allen and others, owners of the barque Hindoo, against R. C. Mackey and others, respondents, and owners of the ship John Quincy Adams. Decree for libellants.]

This was a cause of collision. The libellants were the owners of the barque Hindoo, of Newcastle-on-Tyne, which sailed from Liverpool, in January, 1851, on a voyage to Aden, in the Red Sea, with a cargo of coal. On the 24th of March, 1851, at about one o'clock at night, the Hindoo being then in lat. 5° 22′ S., and lon. 25° 17′ W., the wind

---

[1][Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

being the south-east trade, and blowing about S. S. E., the Hindoo being close-hauled on the larboard tack, with all plain sail set, and going about five knots, the watch on her deck saw a large ship bearing down towards them, with all sails set, including studding-sails alow and aloft, and going dead before 'the wind, at about nine or ten knots. The ship proved to be the John Quincy Adams, of Boston, owned by the respondents. The captain of the Hindoo was called, came on deck, and corrected his reckoning; supposing, as he testified, that the ship intended to speak him. Finding, however, that she was coming too close, he hailed her to port her helm, as did also the mate and all the watch. The helm of the Adams, however, was put first to starboard and then to port; but at what precise time these orders were given, and whether her course was changed essentially, or not, from the time she was first seen, was disputed. The master of the Hindoo testified, that he saw the Adams obey her helm, when it was put to starboard, and that he then perceived that a collision was unavoidable, and gave orders to put up the helm of his own vessel, and square her after-yards, in order to diminish the force of the shock. This order was given and obeyed, but the Hindoo had not time to get round, when the Adams struck her, just aft the mainmast, and cut her down to the water's edge, so that she sunk in fifteen minutes, or less, the officers and crew saving themselves by the bowsprit of the Adams. Much conflicting evidence was given, as to the state of the atmosphere on the night of the collision, whether clear or hazy; as to whether the vessels respectively pursued the proper course, and as to the state and condition of the Hindoo.

William Sohier and John Lowell, for libellants.

S. Bartlett and E. D. Sohier, for respondents.

SPRAGUE, District Judge. Some of the leading facts in this case are not disputed; the total loss of the Hindoo, by collision with the John Quincy Adams; the time and place where this disaster happened; the tacks on which the vessels were sailing. There is no doubt that the sea was smooth, and the night fair, with a moon, but whether there was any, and if so, how much haze or fog, is in controversy. Upon this point, the evidence satifies me that there was not so much haze, as to make this a case of inevitable accident. It is certain, that the Adams was seen a mile and a half, some witnesses say two miles, off. And I am satisfied that the Hindoo might have been seen from the Adams, at least three-quarters of a mile. This is the testimony of Captain Nickels, the master of the Adams. The collision, then, ought to have been avoided. One or both of the parties must be in fault. If both, the loss must

be divided; this is the settled rule in admiralty. The Rival, Case No. 11,867. Some doubt has been expressed on this point, at the bar, but it is the established doctrine of this court.

1st. Was the Adams in fault? It was her duty to clear the Hindoo, because she was going free, and the barque was close-hauled. The vessels were approaching each other, nearly at right angles, and it was the duty of the Adams to go under the stern of the Hindoo. It has been said at the bar, that there is no general rule, and experts have so testified here, but this is a mistake. There are general rules, and it is very important that they should be known, in order that when vessels meet each other suddenly, each may at once adopt the proper measures. These rules are, of course, liable to exceptions and modifications. Thus, if the vessel which is bound to give way, or to take a particular direction, cannot do so with safety, by reason of the proximity of the shore, or of other obstructions, the rule does not apply; but, subject to such variations as peculiar circumstances of this sort may impose, there are general rules, which should be known and adhered to. See 2 Pars. Mar. Law, 202, note 3. In this case, the ship should have gone under the stern of the barque, because, by doing so, the vessels would be constantly increasing their distance from each other, and because this course would not require, on her part, any calculation of the rate of speed at which the other vessel was going. The Adams had ample time to do this, for she might have seen the Hindoo at the distance of three-quarters of a mile, as I have already observed; and if she had attempted to do so, when within half a mile, or a quarter of a mile, with a smooth sea, and with the headway which she had, there is no doubt that she would have cleared the barque. It is so testified by the experts called by the respondents. She did not do so, and the inference is that she must have been in fault.

A good deal has been said about the lookout kept on board the Adams. The build of the ship, and the position of her sails, were such, that from the quarter-deck, those on board could not see much, if at all, forward of the beam, nor could the men of the watch, excepting from the topgallant-forecastle. Some doubt has been raised, as to the number of men on the topgallant-forecastle. I am satisfied that there was but one person there; he was seventeen years old, and rated as a boy. I do not think that this was a sufficient lookout. The respondents ought to have had a man there; one who, if any emergency arose, would be able to give the proper order. In this very case, the boy cried "starboard," which was wrong. The moment the captain came on deck, he at once gave the order to "port" the helm, although from the quarter-deck he could not see the Hindoo; but he says that he knew that any vessel, which they should meet in that place, would be sailing in the direction which the Hindoo actually was taking, in which case the order should have been to port the helm. And he was right. The Adams, then, was to blame for not seeing the Hindoo sooner, and for taking the wrong course after she was seen.

2d. The next question is, was the Hindoo to blame? It is said that she intended to speak the Adams, and that she ought, therefore, to have shown a light, and none was shown. But if she did nothing to carry out this intention, did not alter her course, nor deaden her way, she is not to be accounted blameworthy for a mere intention. The Hindoo was justified in presuming that the Adams would keep out of the way; she had a right to keep her course. It is contended that she deadened her way, first, by backing her topsail, secondly, by taking in her gaff-topsail. It is doubtful whether she did take in her gaff-topsail; and the only two witnesses who speak of it, do not say when it was done. The evidence, as to the maintopsail, is quite clear, that it was not backed till just before the collision, when there was great danger, and then she had a right to do it, in order to try to evade or diminish the imminent shock. If the gaff-topsail was taken in, or let go, it was probably done at the same moment. I do not think, therefore, that the Hindoo was in fault, and the decree must be for the libellants. The case was sent to an assessor, and upon the report made by him, several questions were argued.

SPRAGUE, District Judge. The Hindoo is to be paid for, at her value when lost. The master reported her value, at the port of departure, to be £3500, and he has, upon a rehearing, decided that he can ascertain no diminution of value, from the time of her leaving Liverpool, up to the day of her loss. In his estimate, he has deducted £500 from the value which the witnesses affixed to the vessel, because he was satisfied from the testimony, as to the leak, that she could not have been so well repaired after her former voyage, as those witnesses have supposed.

The respondents contend, that the leak was a great and increasing one, and that the vessel would have been obliged to put into Rio for repairs; and experts were called to show, that the repairs at Rio would have been very expensive. The evidence is very contradictory. I do not think it proves that the leak was an increasing one; the weight of testimony is the other way. Then, as to the testimony of the experts, they were asked what they should judge, from the whole evidence, would be the expense of repairs at Rio. This was not the proper mode of examining witnesses. The evidence was contradictory and voluminous; and instead of thus asking them, in the first place,

to judge of the result of the evidence, and then their opinion, as experts, upon that result, a suppositious case should have been put to them, for their opinion, and the court would have judged whether that case existed. It is no part of the duty or power of experts, to decide upon conflicting evidence. The Clement, [Case No. 2,879; U. S. v. McGlue, Id. 15,679.] And I cannot tell what evidence they adopted; certainly not that of the captain and mate, who testified that there was no leak. There does not appear to be any evidence in the case, from which any one can say what the cause of the leak was; and therefore I cannot adopt these opinions of the experts, nor could they, with any certainty, estimate the amount of repairs required, nor the sum which they would cost.

The libellants, on the other hand, think that too much has been allowed for the leak. I am convinced, by the whole evidence taken together, that the vessel leaked a good deal, and I cannot disturb the master's report, as to the allowance to be made for it. Assuming the master to be correct in his estimate of the value, at the port of departure, I think it is for the respondents to show a deterioration, or depreciation, after the vessel sailed. This they have not done. I have already considered the evidence concerning the leak, and it does not show that the leak increased, or that anything occurred to injure the vessel, from the beginning of the voyage. I think, therefore, the value at the port of departure, must be taken to be the value at the place of the disaster.

Another question, of considerable interest, has been raised and discussed; whether, under the statute of the United States, (1851, c. 43, § 3; 9 Stat. 635; [Rev. St. § 4283,]) limiting the liability of ship owners to the value of the vessel and freight then pending, the freight of the Adams is to be brought in; the same persons owning the vessel and cargo. This is a new question, so far as I know. No cases have been cited at the bar, and I suppose there are none. Under the English statute, the question cannot arise, as it is provided for in terms. It is argued, that no freight was to be paid in this case, and therefore, that none was pending. I think, however, that "freight" is often used in a sense broad enough to cover this case. The old maxim was, "freight is the mother of wages." If you take this literally, and extend to it the rule contended for here, it would exclude the sailors from wages, where the owner carries his own goods. I think the expression "freight pending," is perhaps a little broader than that of the English statute, "freight due or to grow due;" and it may fairly cover the increased value of goods conferred on them by their carriage, which is just as real a gain to the owner of the vessel, and just as real a payment by the owner of the

goods, in the one case as in the other. I take into consideration, also, that this statute limits a responsibility which existed at common law, and therefore must not be extended beyond the fair import of its language. I think that the earnings of the vessel, in transporting the goods of the owner, may well be deemed "freight," within the meaning of this statute, and the amount will be what would have been a fair compensation for transporting the same goods, had they belonged to other persons.

Decree for libellant, for £3500, the value of the Hindoo, and for £900 freight. Total, £4400, or $21,315.36, with interest from the date when the vessel would have arrived at her port of destination, in the ordinary course of such a voyage, $3406.84.

NOTE, [in 16 Law Rep. 692.] A separate libel was filed for the cargo, and interest was allowed on its value from the date of the loss.